UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

HONN DAVID SOK,

                  Petitioner,                    Case No. 1:05-cv-495

v.                                          Honorable Robert Holmes Bell

KENNETH ROMANOWSKI,

                  Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.   Petitioner was convicted by a jury of three charges.  He was sentenced on May 5, 2003 by the Ottawa County Circuit Court to concurrent terms of two to four years for one count of felonious assault with a dangerous weapon, MICH. COMP. LAWS § 750.82, and nine to twenty years for one count of armed robbery, MICH. COMP. LAWS § 750.529, and a consecutive term of two years for one count of felony firearm, MICH. COMP. LAWS § 750.227b.  In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

    I.      PETITIONER HONN DAVID SOK WAS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN THERE WAS INSUFFICIENT EVIDENCE AT TRIAL TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT OF BEING THE PERPETRATOR WHO COMMITTED THE ARMED ROBBERY, FELONY FIREARM, AND FELONIOUS ASSAULT UPON THE VICTIM.

    II.     PETITIONER WAS DEPRIVED OF DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHEN THE TRIAL COURT DENIED PETITIONER'S

> MOTION TO SUPPRESS IDENTIFICATION OF PETITIONER PURSUANT TO THE PHOTO LINE-UP OCCURRING AT THE HOLLAND POLICE DEPARTMENT ON NOVEMBER 13, 2002.

III. PETITIONER WAS DENIED HIS RIGHT TO AN IMPARTIAL TRIAL UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES WHEN THE JURY FOREMAN ENGAGED IN CONVERSATION OUTSIDE THE COURTROOM WITH DETECTIVE BLAKELY, WHO WAS IN CHARGE OF THE INVESTIGATION INTO THE CHARGES LODGED AGAINST PETITIONER, DESPITE SEVERAL ADMONISHMENTS BY THE COURT NOT TO DISCUSS THE CASE WITH ANYONE.

IV. PETITIONER WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL DUE TO MISCONDUCT COMMITTED BY THE PROSECUTOR DURING CLOSING ARGUMENT.

V. PETITIONER WAS DENIED DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHERE: A) THE CHIEF DETECTIVE MADE REFERENCE TO AN UNRELATED HOMICIDE ON FOUR SEPARATE OCCASIONS, AND, B) WHERE COUNSEL FAILED TO OBJECT TO THE OFFICER'S STATEMENTS OR REQUEST A CURATIVE JURY INSTRUCTION.

Respondent has filed an answer to the petition (docket #11) stating that the grounds should be denied because they are without merit or procedurally barred.  Upon review and applying the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA) standards, I find that grounds one, two, four and five are without merit, and ground three is procedurally barred. Accordingly, I recommend that the petition be denied.

**<u>Proposed Findings of Fact</u>**

**A.  Trial Court Proceedings**

 The state court proceedings arose from an armed robbery which occured at the apartment of Sokham Son on October 14, 2002.  An investigation led to the arrest of Petitioner.  He

was charged with armed robbery, felonious assault and possession of a firearm during the commission of a felony.

The following people provided testimony relevant to this habeas petition:  the victim, Sokham Son; her husband, Vannat Steve Dy; the following people who had knowledge of pertinent events relating to the incident on October 14, 2002 –  Damasco Dean Lucero, Heng Van Mork, Lucky Lim, Impaeng "J.P." Phanthasak; officers Sergeant Craig Brace, Deputy Brent Converse, Detective David Blakely and Steve Crumb of the Ottawa County Police Department; Timmy Saroun Sok and Anthony Sok, brothers of Petitioner; Petitioner Honn David Sok; Vicky Sin, girlfriend of Anthony Sok; and Mary VanOmmen, employee of Northland Bowling Lanes.[1]

Sokham Son, the victim, testified that she was at home with her three year-old son at the time of the incident on October 14, 2002.  (Transcript of March 25, 26, 27, 2003 at 95, 99, docket #19.)  Son testified that she did not previously know Petitioner, but that she saw him at a Cambodian Thanksgiving party on October 12, 2002.

Son testified that around five o'clock in the evening on October 14, 2002, there was a knock on her apartment door by a person asking for her husband in Cambodian. (Tr. at 99.)  When she opened the door "the guy standing outside the door just pushed [her] down on the floor and pointed at [her] with a gun."  (Tr. at 100.)  She testified that she "saw his face, and [she] knew it right away," that she would be able to identify him again, and then she identified the Petitioner in the courtroom. (Tr. at 101.)  Son stated that she went on her knees when Petitioner told her to get down, but that she could see her son and the gun.  (Tr. at 103.)  She started to scream and Petitioner pointed the gun at her son and told her that he would shoot her son if she continued to scream.  (Tr.

---

[1]Cary Fleming, Blanca Mayoral, Christina Yates and Terry Tan also testified at trial, but did not provide testimony necessary to the determination of this application.

at 104-05.)  At that time, Petitioner rushed to close and lock the door and Son looked and saw his face when he did that.  Petitioner pulled his jacket up to try and cover his face and told her not to look at him.  But Son testified that she did see his face for a second time when he went to lock the door.  (Tr. at 105.)  Petitioner then came back to Son, pointed the gun at her again and asked for money or a check. When he was told that she had neither, he walked her, at gunpoint, to the bedroom.  (Tr. at 106.)  Son grabbed her family jewelry that was on a table and threw it behind the television.  Petitioner then pushed her to the floor again and punched her in the face. (Tr. at 107.) She stayed on the ground after he pushed her down and pretended to have blacked out while she heard him pick up the jewelry and leave her apartment. (Tr. at 114-15.)  After he left she called her husband and then the police.  (Tr. at 115.)  After the police arrived, Son told them that the robber's "skin [was] a little dark and [he] had a mole on his face."  (Tr. at 121.)  She also told them that he spoke Cambodian and was a little taller than her husband. (*Id.*)

Son testified that the robber, Petitioner, was at a party that Saturday, two days before the incident, and she recognized him from a home video.  She identified him in court from a still photograph taken from that video. (Tr. at 122.)  She noticed him at the party because "his girlfriend is (sic) wearing tight clothes and unusual" and that Petitioner "seemed like a stranger to her" at the party because Son knew most of the other people at the party.  (Tr. at 123.)  Son further testified that there was a time where Detective Blakely asked her to identify the robber from a photo array of six different photos. (Tr. at 124.)  And she identified number 5, Petitioner, as the robber.  (Tr. at 124, 362.)

The husband of the victim, Vannat Steve Dy, testified that he lived in the apartment with the victim.  He testified that on October 14, he went to work around 2:35 or 2:45 p.m. after Son

arrived home from her job.  Around 5:00 p.m., his boss told him that his wife had called, that she was crying, that something had happened at the house and that he needed to go home.  Dy talked to her briefly on the phone and she told him that a "Cambodian, Asian [came] and robbed me."  Dy left immediately and was home in a few minutes.  (Tr. at 253-54.)

When he arrived, Son came out from the bedroom, identified Dy as her husband to the officers and said to Dy that an "Asian guy, he [spoke] Cambodian to me, and . . . robbed me and beat me up.  Now I am hurting.  I am hurting."  (Tr. at 255.)  Dy testified that he tried to calm her down.  He asked her "who did it? She said, I don't remember right now, I don't want to talk about it . . . I am hurting."  (Tr. at 256.)

The officers asked him to translate what his wife was saying and he told them that the robber spoke Cambodian.  Son told the officers, through Dy, that the robber was "taller than [Dy], dark-skinned, and [that] he had a mole, but she didn't point [to] what side [it was on]."  (Tr. at 257.)  Dy asked the officers if he could take her to the hospital and if they could talk later.  The police asked a few more questions.  Son told him that when the robber punched her, she pretended to pass out and did not move until she heard the robber close the door.  Then she screamed for help. (Tr. at 255-57.)  Dy told the officers that the robber was wearing dark blue clothing.  (Tr. at 258.) He and his wife repeated the same things to "Mr. Dave" (Detective Blakely).  (Tr. at 259.)  Son, though Dy, also told the officers that the robber had had a gun.  (Tr. at 276-77.)  Dy then took his wife to the hospital. (Tr. at 260.)  Son told him the same story again at the hospital.  (Tr. at 265-67.)

The next day they had a conversation about the Cambodian Thanksgiving party.  (Tr. at 270.)  Dy asked his wife "if you see the picture, would you recognize the person. And she said, yes, if I saw a picture, I will recognize the person."  (Tr. at 270.)  Steve remembered that a friend

had videotaped the Cambodian Thanksgiving, so he asked to borrow the tape. (Tr. at 270-72.) Heng Van Mork later testified that he was at the Cambodian celebration and videotaped it. (Tr. at 177-78). He stated that he gave the tape to Dy when asked and did not edit it. (Tr. at 178-79).

Dy testified that he watched the tape of the Cambodian Thanksgiving with his wife and others at his apartment. When Son saw Petitioner dancing, she told Dy to stop the tape. Dy testified that he asked her,

> why[?] [The victim] pointed, and she said, he is the one who did it to me. Before I call the cop[s] I want [a] hundred percent from her. I said, are you sure. Take a look real close. I don't want to make a mistake and call the cop[s], because when they come in, that means I have to tell them the truth, I don't want you tell me [sic] or lie to me. I want what is true. She said, yes [a] hundred percent, why I want to tell you a lie [sic], if he [didn't] hurt me. And I asked her over and over again, and she kept repeating, [a] hundred percent, that's him.

(Tr. at 273.) So Dy called "Mr. David," referring to Detective Blakely, to tell him about the identification. (Tr. at 273.) Dy also testified that he was at Petitioner's preliminary examination in this case and that his wife identified Petitioner as the man who was at her door. Dy then confirmed that Petitioner was the same person his wife identified at the preliminary examination. (Tr. at 274-75.)

Sergeant Craig Brace of the Ottawa County Sheriff's Department was the first to respond to the scene. (Tr. at 78-80.) When he walked up to the apartment he heard a woman crying and "hysericall[ly] screaming." (Tr. at 80.) Upon entering the apartment, he noticed that the woman's face was battered and her eye was almost swollen shut. (Tr. at 81.) After another officer, Deputy Converse, arrived, they secured the apartment. (Tr. at 82.) The woman's husband, Steve Dy, arrived shortly thereafter. (Tr. at 83.) Dy spoke with his wife, who appeared to only know a little English, and asked her for a description of the robber. Dy translated what she said and told

- 6 -

Sergeant Brace that the robber was "a Cambodian or Asian male, approximately 5 foot 6 inches tall, maybe 30 years old and wearing . . . a blue hooded sweatshirt, had his hood on and had a mark on his face.  She wasn't sure at that time if it was on the right or left.  She said there was a mark on his face."  (Tr. at 85.)

Deputy Brent Converse of the Ottawa County Deputy Sheriff testified that he arrived after Sergeant Brace and saw a "smaller Asian female with obvious injuries to her face."  (Tr. at 319-20.)  The injuries he observed were that "the right side of her face had red, swelling, even the starting stages of bruising.  Around her nose [he] noticed that there was some dried blood . . . [and] blood dried on her hand. [He] also recall[ed] one of her fingers . . . was already swollen up."  (Tr. at 320.)  He stated that the victim identified to Deputy Converse, though her husband, that the robber "had a black spot on his face and that he spoke Cambodian."  (Tr. at 321.)  She did not specifically identify which cheek, but she pointed to the right side of her face.  (*Id.*)  Converse testified that the victim also indicated that the robber was slightly taller than her husband, so he estimated that the robber was approximately five and one-half feet tall.

Detective David Blakely of the Ottawa County Sheriff's Department was dispatched to the armed robbery and arrived at approximately 5:40 p.m. (Tr. at 334-35.)  The victim's husband was already at the scene when Detective Blakely arrived. He saw that Deputy Converse was questioning the victim so he sat back and observed.  He testified consistently with Deputy Converse's testimony about the description given by Son. (Tr. at 336-37.)  Additionally, Detective Blakely testified that there was blood on a mirror and a blind in the master bedroom and on a doorway below the door handle.  (Tr. at 341-42.)  Samples of the blood were taken by Deputy Converse and given to Detective Jim Brack, the "evidence tech," but were not analyzed by a lab.

(Tr. at 342.)  Detective Blakely also testified that a Marlboro Light cigarette butt was found in the stairway by the victim's apartment.  (Tr. at 345.)

On October 15th, the victim's husband contacted Detective Blakely about a videotape which had recorded the robber dancing.  The victim identified the robber to Detective Blakely.  (Tr. at 345-46.)  Detective Blakely took the tape to Detective Brack so that he could print off a photo of the suspect who had been identified.  (Tr. at 346.)  Blakely testified that Dy told him that the man's name was David and he had two brothers, Anthony and Tim.  (Tr. at 348.)  Based on that information, they began to search for such an individual.  They found and arrested Petitioner on October 23, 2002.[2]  (Tr. at 350.)

After Petitioner was arrested, Detective Blakely put Petitioner in his cruiser, read him his *Miranda* rights and drove him to the Ottawa County Jail.  (Tr. at 350-51.)  Blakely asked Petitioner questions during the drive.  Petitioner stated that he did not know anyone by the name of Tony B., Vannat Dy, or Steve Dy.  (Tr. at 351-52.)  Petitioner stated that he had not been to 529 136th Avenue, the apartment complex where the robbery took place, and did not know anyone who lived there.  (Tr. at 352-53.)  Petitioner also stated that he had no knowledge of the robbery that had taken place at that apartment complex.  (Tr. at 353-54.)

Petitioner was taken to police headquarters, across from the jail and placed in an interview room.  (Tr. at 353.)  Petitioner reiterated that he knew nothing of the robbery and did not know anyone by the name of Tony B., Vannat Dy or Steve Dy.  Petitioner stated that he did not have access to or possession of any weapons, but that they would have to get a search warrant to search Petitioner's home.  (Tr. at 354.)  Petitioner was then placed in the jail.  (Tr. at 354.)  When Detective

---

[2]At trial, Detective Blakely stated that they arrested Petitioner on October 23, 2003.  However, since the trial took place in March 2003, clearly the jury would assume that Detective Blakely meant the previous year.

Blakely searched Timmy Sok's residence, where Petitioner had been staying, no weapon was located and no blood was found.  (Tr. at 355-56.)

The next morning, October 24, 2002, Blakely, together with Detective Crumb, spoke with Petitioner.  (Tr. at 356.)  At that time, Petitioner admitted that he knew Tony B. and Vannat Dy. (Tr. at 356-57.)  Petitioner stated that Dy was his bookie and knew him through prior gambling associations.  (Tr. at 357.)  When asked if he knew the apartment complex, Petitioner began by "saying that he didn't know where Vannat [Steve Dy] lived, however, that him [sic] and his brother, Anthony, had been to that location and that they stopped to see . . . J.P., and that they went up to check on football scores."  (Tr. at 357-58.)  Petitioner said that "he was checking scores at Tony B.'s place" and his brother pointed across the hall and told him that was where Dy lives.  (Tr. at 358.)  At that point, Blakely asked Petitioner if there was any reason that his fingerprints would be on Dy's door.  Petitioner then stated that he knocked on the door and reached down and grabbed the door handle to see if Dy was there.  (Tr. at 359.)  Petitioner stated that he was wearing a white turtleneck, blue jeans and a black jacket with a "casual type hood."  (Tr. at 359.)  Petitioner also stated that he smoked Marlboro Light cigarettes, but denied smoking in the hallway outside Dy's apartment.  (Tr. at 358.)

A photo line-up was conducted around November 13, 2002.  (Tr. at 360; Transcript of the Motion to Suppress Hearing (Mot. to Suppress Tr. at 2, docket #18.)  Detective Blakely described the process of creating a photo line-up as follows: "[W]e enter the specific height, weight, complexion of the suspect, as well as a booking photo of the initial suspect, and then it is shown to any witnesses or victims. . . ."  (Tr. at 361.)  The victim was shown the line-up and immediately picked number five, who was Petitioner.  (Tr. at 124, 362.)

Detective Blakely testified that the cigarette butt that was found in the hallway outside the victim's apartment was not submitted for DNA trace evidence because it was a "moot point," as it had already been established that Petitioner had been in the hallway. (Tr. at 362.) Also, as with the blood, the lab would not have been able to process it in time for the trial. (Tr. at 362-63.)

On rebuttal, Detective Steve Crumb with the Ottawa County Sheriff's Department testified regarding the conversation in the car after Petitioner's arrest. Petitioner said that he did not know Tony B. or Vannat Steve Dy. (Tr. at 467.) Crumb stated that Petitioner said that he had not been to the apartments at 529 136th Avenue. Petitioner was transported to the police headquarters and was placed in an interview room with Crumb and Blakely where he was asked the same questions and repeated the same answers. (Tr. at 468-69.)

Crumb testified that the next day there was another interview. (Tr. at 469.) At that point, Petitioner stated that he knew Tony B. and Vannat Dy. (Tr. at 470.) Petitioner also indicated that he had been to the apartments in question. Crumb further testified that Petitioner told them that he had touched the door and doorknob to the apartment where the robbery took place because he has been across the hall with his brother. (*Id.*)

Lucky Lim testified that on October 14, 2002, she was living with "Tony B.," Vannat Steve Dy's brother, across the hall from the victim's apartment. When she came home to her apartment that day, she noticed Anthony Sok, J.P. and Petitioner in the parking lot. (Tr. at 194.) Lim testified that she spoke with them in the parking lot and that they were there for about "ten, fifteen minutes" around 4:30 p.m. and that during the conversation they told her to go golfing because her boyfriend was there. Lim testified that she had found it odd that they told her to go

- 10 -

golfing.  (Tr. at 195-97.)  She further testified that Petitioner told her to go golfing three or four times.  (Tr. at 199.)  She testified that she told Deputy Converse that Petitioner looked up at the apartment while they were talking and that she found that to be strange.  (Tr. at 198.)  After about fifteen minutes, she left to go golfing.  (Tr. at 199.)

Impaeng Phanthasak ("J.P.") testified that he lived in the victim's apartment building and that he came home around 4:00 or 4:30 p.m. on October 14, 2002.  (Tr. at 212.)  He testified that, after going in his apartment and coming out again, he saw Anthony Sok and Petitioner in the parking lot.  (Tr. at 212-14, 224.)  He was talking with Petitioner and Anthony in the parking lot when Lucky Lim joined the conversation.  (Tr. at 216-17.)  J.P. heard Petitioner and Anthony tell Lim that Tony B. went golfing and told her to go golfing too.  (Tr. at 219.)  He heard Petitioner tell Lim to go golfing twice, and he did not find it odd because Tony B. was her boyfriend.  (Tr. at 221.)  But he remembers telling Deputy Converse that he thought it was funny to try to persuade someone to go golfing when she had not thought about it at all.  In retrospect, he believes that Petitioner had been trying to get rid of Lim.  (Tr. at 222.)  After the conversation, J.P. went into his apartment and fell asleep on the floor close to the television.  (Tr. at 225.)  On cross, J.P. testified that he was under the impression that Anthony and Petitioner were leaving the complex because he saw them backing the car up.  (Tr. at 233-36.)  But he did not know if the car just backed up and then stopped.  (Tr. at 238.)

Timmy Saroun Sok, Petitioner's youngest brother, testified that he had set up a golf outing with Damasco Dean Lucero and Tony B. for October 14, 2002.  (Tr. at 158-62).  He also testified that Petitioner smoked Marlboro Light cigarettes and that he told Petitioner that he was

going golfing.  (Tr. at 162-65.)  Damasco Dean Lucero also testified that he went golfing with Tony B. and Timmy Saroun Sok.  (Tr. at 172-76.)

Anthony Sok, Petitioner's younger brother, testified that Petitioner had been staying at Timmy's house for about three weeks prior to October 14th.  (Tr. at 286.)  That day Anthony, Tony B. and Petitioner were watching television and eating at Timmy's house.  They talked about going bowling or golfing.  (Tr. at 288.)  He and Petitioner left Timmy's house sometime in the afternoon, went bowling and made a stop at J.P.'s house.  (Tr. at 289.)  J.P. was not home, but drove into the parking lot as they were leaving.  (Tr. at 291.)  After knocking on J.P.'s door, Anthony went up the stairs and knocked on Tony B.'s door, but he was not at home either.  He testified that Petitioner never came up the stairs.  (Tr. at 292-93.)  Anthony testified that he knew that Timmy was going golfing with Tony B. and that Timmy had left the house before he and Petitioner left.  (Tr. at 294.)  Anthony testified that Tony B.'s girlfriend, Lucky Lim, came up and talked with them while he and Petitioner were talking to J.P.  (Tr. at 296.)  He testified that he does not remember Petitioner asking Lim to leave or trying to get rid of her.  (Tr. at 297.)  At some point, Lim left and J.P. went inside.  Anthony testified that he went to the North Lanes Bowling Alley and arrived there between 4:30 and 5:00 p.m.  (Tr. at 298.)  He and Petitioner were the only customers at the bowling alley.  (Tr. at 300.)  After the bowling alley, Anthony and Petitioner went to Hamilton Creek for fifteen or twenty minutes and then went back to Timmy's house.  (Tr. at 300-01.)

Petitioner testified that he watched television with Anthony and left with him around 3:00 p.m. to go to J.P.'s to talk about cars.  Petitioner testified that he and Anthony arrived at J.P.'s around 4:00 to 4:30 p.m.  Upon arrival, Anthony knocked on J.P.'s door and then went upstairs and knocked on Tony B.'s door.  Petitioner stood behind Anthony when he was knocking on the doors.

(Tr. at 393-94.) Petitioner testified that he did not go over to the victim's apartment. Then J.P. came home and the three of them were talking. After about ten to fifteen minutes, Lucky Lim came over and joined the conversation. When Lim was getting out of her car, Petitioner said to her that he thought she was golfing with her boyfriend Tony B. He testified that that was the only time he mentioned going golfing to her. Lim left the complex and J.P. went inside. After they left, Petitioner and Anthony got in the car and left to go to the bowling alley around 4:30 or 4:45 p.m. (Tr. at 395-99.) At the bowling alley, Petitioner spoke with Mary VanOmmen and then played the "claw game" winning seven stuffed animals. They stayed for fifteen or twenty minutes and then went to Hamilton, Michigan to see if the salmon were running. Petitioner testified that it took about thirty-five minutes to drive to Hamilton, that they stayed for fifteen or twenty minutes and then drove home. (Tr. at 399-403.) They ate dinner as a family after his brother Timmy returned from golf. (Tr. at 404.) At dinner, Timmy mentioned that there had been a robbery at the apartment complex. (Tr. at 404.)

Petitioner testified about his conversations with Detectives Blakey and Crumb. There were two interviews, one in the car after the arrest and one the next day. In the first interview, Petitioner stated that he did not know some of the names he was asked. Petitioner testified that, at first, he did not know the names that he was asked because in Cambodian culture it is disrespectful to use names. In Cambodian culture, they call each other different terms rather than names. (Tr. at 407-08.) Petitioner admitted that he knew the apartment and that he had been there that day, but knew nothing about the robbery. (Tr. at 408-09.)

Petitioner testified that in the second interview he said that he knew Tony B., had been to the apartment complex on October 14th, then went bowling and went home for dinner. (Tr.

- 13 -

at 410.)  Petitioner testified that he attended the Cambodian Thanksgiving on October 12th.  (Tr. at 411.)  He also testified that he had never seen the victim before these proceedings.  (Tr. at 412.)

Mary VanOmmen is an employee at Northland Lanes.  She testified that Anthony Sok came to the bowling alley to refresh her memory about what time they had been at the bowling ally on October 14th.  (Tr. at 447-48.)  She testified that, after talking to her boss, she decided that she would have come to work about 3:45 to 4:00 p.m.  She testified that she does not remember if it was October 14th when Petitioner and Anthony came to the bowling ally, but she knew that they played the game with the claw that catches the stuffed animals one day.  She saw that they had caught a lot of animals when they walked out.  (Tr. at 448-49.)  They were the only ones there at the time.  The bowling league starts at 5:15 p.m., so people start coming in around 5:00 p.m.  Therefore, Petitioner and Anthony were there between 4:00 and 5:15 p.m.  (Tr. at 450.)  On cross-examination, she testified that they could have come in another day and she was not exactly sure which day of the week it was.  (Tr. 452-53.)

Vicky Sin, the girlfriend of Anthony Sok testified that she was with Anthony, Timmy and Petitioner for part of the afternoon of October 14, 2002, and then again in the evening.  They left at some point in the afternoon and when they came back they had stuffed animals.  (Tr. at 456-57.)

Prosecutor Bunce and defense counsel Piper both gave closing arguments at the end of the testimony.  At the conclusion of trial, on March 27, 2003, the jury found Petitioner guilty of armed robbery, felony firearm, and assault with a dangerous weapon.  (Transcript of March 27, 2003 at 558, docket #20.)  On May 5, 2003, Petitioner was sentenced to serve concurrent terms of 9 to 20 years for the armed robbery, and 2 to 4 years for the assault with a dangerous weapon, and a

- 14 -

consecutive term of 2 years for the felony firearm conviction. (Sentencing Transcript ("S. Tr.") at 9, docket #21.)

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by his counsel on January 14, 2004, and supplemental brief, which was filed *in pro per* on April 7, 2008, raised the same five issues as raised in the instant application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #23; Def.-Appellant's Supp. Br. in Propria Persona, docket #26.)  Petitioner filed a motion to remand, which was denied by the Michigan Court of Appeals on May 28, 2004.  (*See* 5/28/04 Mich. Ct. App. Ord, docket #26.)  By unpublished opinion issued on October 12, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 10/12/07 Mich. Ct. App. Opinion ("MCOA Op."), docket #22.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same five claims rejected by the Michigan Court of Appeals. By order entered June 28, 2005, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* 6/28/05 Mich. Ord., docket #23.)

Petitioner has sought no other post-conviction relief before filing the instant habeas petition. (Pet. at 3.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). "Yet, while the principles of 'clearly established law' are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be  instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001). A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

   A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

   Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de*

- 17 -

*novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

> The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

### I.    Insufficient Evidence

> Petitioner asserts that he was denied a fair trial and due process because there was insufficient evidence to prove that he was guilty beyond a reasonable doubt of the crimes for which he was convicted. (Pet. at 6.) Specifically, Petitioner asserts that the eye witness identification by the victim was insufficient to identify him as the perpetrator. (Mem. of Law in Supp. of Pet. ("Mem. in Supp.") at 16-17, docket #28.)

> A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The Michigan Court of Appeals addressed, and rejected, Petitioner's claim as follows:

> Defendant first argues that there is insufficient evidence to establish that he was the perpetrator. We review de novo a claim regarding the sufficiency of the evidence. *People v Lueth,* 253 Mich App 670, 680; 660 NW2d 322 (2002). The test for determining whether sufficient evidence has been presented to sustain a conviction is whether, viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Nowack,* 462 Mich 392, 399-400; 614 NW2d 78 (2000). All reasonable inferences and credibility choices should be made in support of the jury verdict. *Id*. at 400.

> Defendant's argument on appeal is limited to challenging the sufficiency of the evidence regarding defendant's identity as the perpetrator. Identity is always an essential element of a criminal prosecution. *People v Oliphant,* 399 Mich 472, 489; 250 NW2d 443 (1976). According to defendant, he presented an alibi defense which established that he could not have been present at the place and time that the victim was robbed and assaulted. At trial, defendant claimed that he was with his brother, Anthony Sok, at the time of the offenses. Anthony's testimony was corroborative of this statement. But in direct contradiction to defendant's and Anthony Sok's testimony, the victim identified defendant as the perpetrator both before and during trial. Before trial, the victim identified defendant as the perpetrator from a photographic array containing six photographs. In addition, the victim identified defendant as the perpetrator while watching a videotape of the Cambodian

- 19 -

Thanksgiving party that she and defendant both attended two days before she was robbed. The victim told her husband that she was one hundred percent certain that defendant was the perpetrator. The victim also told her husband and Deputy Brent Converse that the perpetrator, like defendant, was Asian, spoke Cambodian, and had a mole or black mark on his face. And, at trial, the victim identified defendant as the perpetrator.

Notwithstanding defendant's and Anthony Sok's testimony, the victim's identification of defendant is sufficient to establish defendant's identity as the perpetrator. "[P]ositive identification by witnesses may be sufficient to support a conviction of a crime." *People v Davis,* 241 Mich App 697, 700; 617 NW2d 381 (2000). "The credibility of identification testimony is a question for the trier of fact that [this Court does] not resolve anew." *Id.* The fact that the jury found defendant guilty indicates that the jury weighed the evidence, rejected defendant's and Anthony Sok's alibi testimony, and found the victim's identification of defendant as the perpetrator to be more credible than defendant's and Anthony's testimony. It is the jury's function, not the function of this Court, to determine the weight of evidence and the credibility of witnesses. *People v Wolfe,* 440 Mich 508, 514-515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992). In light of the victim's identification of defendant, there was sufficient evidence to establish defendant's identity as the perpetrator.

(MCOA Op. at 1-2.)

The state-court's determination constituted a reasonable application of established Supreme Court precedent. The prosecutor presented ample evidence from which the jury could conclude that Petitioner was the person who robbed Ms. Son and her son. As noted by the Michigan Court of Appeals, the victim identified Petitioner as the perpetrator both before and during the trial. The victim testified that she "saw [the robber's] face, and [she] knew it right away," and that she would be able to identify him again. She subsequently identified Petitioner in the courtroom. (Tr. at 101.) She testified that she recognized the perpetrator as the Petitioner because she recognized him from the Cambodian Thanksgiving party the prior Saturday, and she confirmed the identification from a home videotape taken of the event. (Tr. at 122.)

- 20 -

The victim's husband, Vannat Steve Dy, confirmed the identification in his testimony. Dy testified that he watched a videotape of the party with his wife and when she saw Petitioner dancing, she told Dy to stop the tape. Dy testified his wife claimed to be a "hundred percent" certain that Petitioner was the person who robbed her. (Tr. at 273.) Son additionally identified the perpetrator as Petitioner in a photo line-up which was conducted by Detective David Blakely. (Tr. at 124, 362.) As also noted by the Michigan Court of Appeals, Son told her husband and Deputy Converse that the perpetrator, like Petitioner, was Asian, had dark skin, and had a black spot on his cheek. (Tr. at 255-57, 321.) And, at trial, Son identified Petitioner as the perpetrator. (Tr. at 125.) Defendant's own admissions also put him at the location of the crime, put his hand on the victim's door, and establish that he wore a hooded jacket and smoked Marlboro cigarettes, all facts consistent with the victim's testimony.

While Petitioner contends that the testimony of his brother Anthony Sok and Mary VanOmmen, the failure to identify any of his fingerprints at the scene, and the lack of the stolen property at his residence is more compelling than the victim's identification, the prosecutor presented more than sufficient evidence from which the jury could find Petitioner was the perpetrator of the robbery in this case. "It is the province of the fact-finder, not this court, to weigh the probative value of the evidence and resolve any conflicts in the testimony." *McKenzie*, 326 F.3d at 727. Accordingly, I find that the jury could have found the essential elements of the crime beyond a reasonable doubt and Petitioner's claim is without merit.

## II.     Denial of Motion to Suppress

Petitioner's claim in Ground II is that his due process rights were violated when the trial court denied his motion to suppress the photographic identification by the victim. (Pet. at 13-

18.)  Petitioner's motion was predicated on the fact that two of the men in the photo array were Cambodian, like Petitioner, while the other four were Laotians, which Petitioner asserts have lighter skin than Cambodians.  (*Id*. at 14.)  The motion to suppress also asserted that Petitioner was the only individual in the photo array who had moles or marks on his cheek, which was an important distinction because the victim identified the perpetrator as having a mark on his cheek.  (*Id.*)

The Due Process Clause prohibits the use of an identification which is impermissibly suggestive under the totality of the circumstances and which presents an unacceptable risk of irreparable misidentification.  *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir. 2000).  In reviewing a due-process claim involving an identification procedure, the Supreme Court has adopted a two-part test: (1) the defendant must show the identification procedure was impermissibly suggestive; and (2) if the procedure was suggestive, the court examines the totality of the circumstances to determine whether the identification was nonetheless reliable.  *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992) (synthesizing Supreme Court precedent).  In examining the totality of the circumstances, the court considers several factors, including: "(1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the crime and the confrontation."  *Id*. (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).

The Michigan Court of Appeals addressed, and rejected, Petitioner's claim stating as follows:

> Defendant next argues that the trial court erred in denying defendant's motion to suppress the victim's identification of defendant from a photographic array. "[T]he trial court's decision to admit identification evidence will not be reversed unless it is clearly erroneous."  *People v Kurylczyk,* 443 Mich 289, 303; 505 NW2d

528 (1993). "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id.* A photographic identification procedure violates a defendant's right to due process of law when, in light of the totality of the circumstances, it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification. *Id.* at 302. A photographic array is generally not considered suggestive if "'it contains some photographs that are fairly representative of the defendant's physical features and thus sufficient to reasonably test the identification.'" *Id.* at 304, quoting Sobel, Eyewitness Identification, § 5.3(a), pp 5-9 to 5-10. "Physical differences among the lineup participants do not necessarily render the procedure defective and are significant only to the extent that they are apparent to the witness and substantially distinguish the defendant from the other lineup participants." *People v Hornsby,* 251 Mich App 462, 466; 650 NW2d 700 (2002). Furthermore, "[p]hysical differences generally relate only to the weight of an identification and not to its admissibility." *Id.* According to defendant, who is Cambodian, the photographic array shown to the victim was impermissibly suggestive because only two of the six photographs in the array depicted Cambodians, while the other four depicted Laotians who have lighter skin than Cambodians, and because defendant had a distinctive mole on his left cheek and none of the other individuals in the photographs had identifying marks on their faces. We have examined the photographic array and we disagree with defendant's contention that the lightness or darkness of the skin of the individuals depicted in the photographs renders the photographic array impermissibly suggestive.

Although the skin tones of the individuals are not all identical, they do not render the array impermissibly suggestive. Moreover, the apparent lightness of some of the individuals may be due to the quality of the photographs. Furthermore, the photo lineup was not impermissibly suggestive because defendant has a mole on his left cheek, while none of the other individuals in the photo array had distinguishing marks on their faces. The mole on defendant's left cheek, as depicted in the photo of defendant, is very light and not glaringly obvious. We concur with the trial court's characterization of defendant's facial mole as being "de minimis." Overall, the physical differences among the lineup participants that did exist were minor and did not substantially distinguish the defendant from the other lineup participants. We find no clear error in the trial court's admission of the pre-trial identification.

We also reject defendant's suggestion that the trial court should have required the victim to identify him in a corporeal lineup rather than by a photographic array. The use of a photographic array rather than a corporeal line-up is permissible if "[t]here [is an] insufficient number of persons available with defendant's physical characteristics." *People v Anderson,* 389 Mich 155, 187 n 22; 205 NW2d 461 (1973), overruled on other grounds *People v Hickman,* 470 Mich 602; 684 NW2d 267 (2004). In this case, Detective Blakely made substantial efforts to conduct a corporeal lineup, but was unable to do so because of the lack of individuals with physical characteristics similar to those of defendant. "There is no authority that

- 23 -

requires the police to make endless efforts to attempt to arrange a lineup." *People v Davis,* 146 Mich App 537, 547; 381 NW2d 759 (1985). Under the circumstances, we find that the use of a photographic array rather than a corporeal lineup in this case was permissible.

(MCOA Op. at 2-3.)

Petitioner argues that the photo array was impermissibly suggestive because the image of Petitioner "was implanted in the victim's mind when she viewed a Cambodian Thanksgiving party video in which Petitioner stood out because of the manner in which he was dancing." (Mem. in Supp. at 23.) Petitioner further asserts that this image was in her mind when she saw the photographic array where he was the only "man with marks on his face and of Cambodian origin." (*Id.* at 23-24.)

Despite Petitioner's assertions, evaluating the totality of the circumstances under the five factors set forth by the Supreme Court, the photographic array was not impermissibly suggestive. Regarding the first and second factors, the victim testified that she clearly saw the perpetrator's face twice at the time of the robbery. Son testified that when she opened the door "the guy standing outside the door just pushed [her] down on the floor and pointed at [her] with a gun." (Tr. at 100.) But Son further testified that she "saw his face, and [she] knew it right away" that she would be able to identify him again and then she identified the Petitioner in the courtroom. (Tr. at 101.) She testified that she screamed and the robber pointed the gun at her son and told her that we would shoot her three year-old son if she continued to scream. (Tr. at 103-05.) At that time, Petitioner rushed to close and lock the door and Son looked and saw his face again. Son testified that Petitioner pulled his jacket up to try and cover his face and told her not to look at him. However, she did see his face for a second time when he went to lock the door. (Tr. at 105.) Her

- 24 -

testimony indicates that she was paying significant attention to the person holding the gun to her head and pointing it at her three year-old son.

Regarding the third factor, Son accurately described Petitioner immediately after the incident and recognized him from a their recent attendance at a Cambodian Thanksgiving party. Immediately after the robbery, the victim, through translation by her husband, described the perpetrator as "a Cambodian or Asian male, approximately 5 foot 6 inches tall, maybe 30 years old and wearing . . . a blue hooded sweatshirt, had his hood on and had a mark on his face." She was not sure at that time if it was on the right or left, but she said there was a mark on his face. (Tr. at 85.) Her husband's and Deputy Brent Converse's testimony confirmed that she had given them the same description, which matched that of Petitioner.[3]  (Tr. at 255-57, 321, 324-25.)

The fourth factor considered is the witness's level of certainty when identifying the suspect. The testimony indicated that the victim immediately identified Petitioner in the photo array. Detective Blakely testified that a when a photo array was conducted, the victim was shown the line-up and immediately picked number five, which was Petitioner. (Tr. at 362.)  Petitioner's argument that the victim's identification was tainted somehow because she had seen him in a video prior to the photo array identification fails. The victim, of her own volition, remembered seeing him earlier at the Cambodian Thanksgiving party, tracked down an unedited home video of the event, and picked out Petitioner from the video. All of this occurred prior to viewing the photo array or any other suggestion by the police that Petitioner was a suspect. In fact, Petitioner only became a suspect after Son identified him from the video and contacted Detective Blakely. (Tr. at 345-46.)

---

[3]Petitioner makes some assertion that the mark or mole on his face is located on his left cheek and the victim's description was inaccurate because she indicated that the marks were on the right side. (Mem. in Supp. at 24.) However, there even appears to be confusion by Petitioner and the trial court when describing on which side the moles are located during the hearing on Petitioner's motion to suppress the photo identification. (Mot. to Suppress Tr. at 8-9.)

Additionally, there is no indication from the testimony that the police provided her with the tape to review before the photographic line-up occurred.

The last factor to consider is the length of time elapsed before the photo line-up occurred. In this case, the photo line-up occurred around November 13, 2002, only a month after the robbery took place. (Mot. to Suppress Tr. at 2.)

Upon consideration of the totality and the five factors outlined in *Hill*, I conclude that the state court's determination that line-up was not impermissibly suggestive was a reasonable application of established Supreme Court precedent.

### III.    Impartial Jury

Petitioner asserts that he was denied an impartial jury because his brothers, Timmy and Anthony Sok, and Vicky Sin, the girlfriend of Anthony Sok, allegedly witnessed Detective Blakely speak with the jury foreman during a recess in the proceedings. (Pet. at 19; *see also* Aff. of Timmy Sok, Anthony Sok and Vicky Sin, docket #22.) Because Petitioner did not raise the issue at trial, the Michigan Court of Appeals reviewed the issue only for plain error, stating:

> Defendant next argues that he was denied his constitutional right to a fair and impartial trial when the jury foreman engaged in a conversation with Detective Blakely during a break in the proceedings. Because defendant failed to raise the alleged constitutional error below, we review this issue for plain error that affected defendant's substantial rights. *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* at 763. Under the third requirement, a showing of prejudice is necessary. A defendant has been prejudiced if "the error affected the outcome of the lower court proceedings." *Id.*

> In support of his contention that the jury foreman spoke with Detective Blakely, defendant provides three nearly identical affidavits, two from his brothers and the other from one of his brother's girlfriend, in which the affiants assert that they saw the jury foreman speaking with Detective Blakely. The affidavits are silent regarding the content of the alleged conversation between the foreman and Detective

Blakely. If Detective Blakely did in fact converse with the jury foreman, plain error occurred because Detective Blakely was a witness in the case, and the trial court specifically instructed the jury not to "talk to the defendant, the lawyers or the witnesses about anything at all, even if it has nothing to do with the case." Conduct violating the trial court's instructions is clearly and obviously error. *Id.* However, given the lack of information regarding the content of any alleged conversation, any error does not require reversal because defendant cannot show how he was prejudiced. [FN1]

FN1 We denied defendant's suggestion to remand for a hearing to determine the nature of the content of any alleged conversation between Detective Blakely and the jury foreman pursuant to an order dated May 28, 2004.

(MCOA Op. at 3.) Respondent argues that Petitioner's claim is procedurally defaulted because he did not raise it at trial. (Resp't's Resp. at 12-13, docket #11.)

When a state-law default prevents further state consideration of a federal issue, federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal

- 27 -

habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim.  It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g.*, *People v. Kelly*, 423 Mich. 261, 271 (1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee*, 534 U.S. at 385.  Further, even though the court of appeals applied a limited review of the claimed error to determine whether it affected the outcome, Petitioner's failure to object is still considered a procedural default.  *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Clifford v. Chandler*, 333 F.3d 724, 728-29 (6th Cir. 2003), *overruled in part on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003) (citing *White v. Schotten*, 201 F.3d 743 (6th Cir. 2000), and *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000)); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *accord Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994).  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  Accordingly, review

- 28 -

by this court is barred unless Petitioner can show cause and prejudice. *See House*, 547 U.S. at 536;

*Murray,* 477 U.S. at 495; *Hicks*, 377 F.3d at 551-52.

        To show cause sufficient to excuse a failure to raise claims on direct appeal,

Petitioner must point to "some objective factor external to the defense" that prevented him from

raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467,

497 (1991). Petitioner has not even attempted to explain why he could not have raised this issue

before the trial court. Where a petitioner fails to show cause, the court need not consider whether

he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100

(6th Cir. 1985). Moreover, Petitioner also has not demonstrated that manifest injustice would result

because he has not made a colorable claim of innocence; he has not shown that any constitutional

error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at

322 (citing *Murray*, 477 U.S. at 495). Accordingly, I conclude that this claim regarding an

impartial jury is procedurally barred.

### IV.    Prosecutorial Misconduct

        Petitioner asserts that, during the closing argument, the prosecutor improperly

vouched for the credibility of Detectives Crumb and Blakely. (Pet. at 19-20.) Petitioner asserts that

"the prosecutor twice used the police officer's [sic] 17 and 20 years of service to the county to attack

the credibility of Petitioner Sok and [to] support the credibility of the officer's [sic] statements.

(TT pages 496, 539)." (Pet. at 19.) In the first instance, Prosecutor Bunce said:

        Now, the defendant takes the stand and says, I never touched that doorknob.
I never touched that door. *What did we just hear from Detective Steve Crumb who
has been in the service of the county for 20 some years?* That he used that baiting
question to see what the Defendant would say. What if I were to tell you that we
found your fingerprints on the inside of that apartment? The defendant's response

- 29 -

was, I knocked, and I might have touched the doorknob on the outside, but you won't find my fingerprints inside. What's important about that?

The important thing is that the defendant takes the stand and denies that conversation even occurring. Who has been consistent here? All the investigators that have taken the stand have been consistent in their testimony about what they heard, what they saw and what they did.

Who is the only witness that has taken the stand in these two days that has not been consistent in testimony? The defendant.

(Tr. at 496-97) (emphasis added). In the second instance, the prosecutor stated in his rebuttal that:

Detective Blakely was working for the Ottawa County Sheriff's Department for 17 years, working in the Detective Bureau since 1994. Is he mistaken in his testimony or is he outright lying to you in his testimony as he relates to you the conversation that he had with the defendant?

Was Detective Crumb, a detective with the Ottawa County Sheriffs [sic] Department for over 20 years, mistaken when he tells you about the interviews that he participated in with the defendant. Was Detective Crumb outright lying to you about what was asked of the defendant and what the defendant said. I submit to you that that is utterly ridiculous and ludicrous. They have absolutely nothing as far as personal gain to come in here and say that to you.

They have reports that they generated. You have seen those reports were given to the defendant, to the defense attorney, which lay out what they did, what they said, what they heard.

Who has motivation to stand before you and actually sit before you and not tell you absolutely everything that happened? That leaves but one person, the defendant.

(Tr. at 529-30) (emphasis added).

Misconduct by a prosecutor can rise to the level of a due process violation. *Lundy v. Campbell*, 888 F.2d 467, 474 (6th Cir. 1989). For relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). When a petitioner makes a claim of prosecutorial

- 30 -

misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

   The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)). The habeas court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). In addition, the court may view any misconduct in light of the strength of the competent proofs tending to establish guilt. *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*). "The touchstone of due-process analysis is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Consequently, the giving of cautionary instructions is relevant to determining whether fundamental fairness was denied. *Id.* at 1356.

   The Michigan Court of Appeals addressed and rejected Petitioner's claim, stating as follows:

   Defendant next argues that prosecutorial misconduct deprived him of his constitutional right to a fair trial. "We generally review de novo allegations of prosecutorial misconduct." *People v Pfaffle,* 246 Mich App 282, 288; 632 NW2d 162 (2001). However, defendant failed to object to the alleged prosecutorial misconduct; therefore, our review is for plain error that affected defendant's substantial rights. *Id.* According to defendant, the prosecutor's comments referring to two police witnesses' years of service were improper because they improperly bolstered the credibility of the witnesses and tended to encourage the jury to believe the testimony of the detectives solely based on the fact that they were policemen. A "prosecutor may not attempt to place the prestige of his office, or that of the police,

- 31 -

behind a contention that the defendant is guilty." *People v Cowell,* 44 Mich App 623, 628; 205 NW2d 600 (1973). And the prosecutor is also not permitted to vouch for the credibility or truthfulness of a witness. *People v Bahoda,* 448 Mich 261, 276; 531 NW2d 659 (1995). However, it is not improper for the prosecutor to comment on the credibility of a witness. *People v Stacy,* 193 Mich App 19, 37; 484 NW2d 675 (1992). The reviewing court must examine the pertinent portion of the record and evaluate a prosecutor's remarks in context. *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999).

Here, the officers' years of service was not utilized to support the prosecution's contention that defendant was guilty. It is evident that the prosecutor was not vouching for the officers' credibility, but rather encouraging the jury to evaluate the officers' credibility and apparent lack of motive to lie. Furthermore, the prosecutor's reference to Detective Blakely's years of service during rebuttal closing argument responded to credibility issues regarding the officer initially raised by the defense. Even "improper remarks by the prosecutor might not require reversal if they respond to issues raised by the defense." *People v Callon,* 256 Mich App 312, 330; 662 NW2d 501 (2003).

(MCOA Op. at 4.)

The Michigan Court of Appeals limited its review to plain error because Petitioner failed to object to the alleged prosecutorial misconduct during the trial. Petitioner's failure to comply with a state procedural rule raises the issue of procedural default. However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

The federal courts have generally recognized two types of objectionable vouching. The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt. *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United States*, 218 F.2d 14, 19 (6th Cir. 1955). Neither type of vouching is involved in this case.

The Sixth Circuit Court of Appeals also has stated that "'it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant.'" *United States v. Krebs*, 788 F.2d 1166, 1176 (6th Cir.1986) (quoting *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir. 1976)). Those decisions, however, rested on the court's supervisory power to control federal procedure. In contrast, on habeas review, the federal court lacks supervisory power over state courts, and the Court's inquiry on habeas review is limited to determining only whether the improper comments constitute a due process violation. *Byrd v. Collins*, 209 F.3d 486, 529, 536 (6th Cir. 2000). The Sixth Circuit has stated that it has "not discovered . . . any cases in which we have granted habeas relief on the basis of improper vouching." *Id.* at 536. Rather, the "few cases in which vouching provided a basis for relief were in the context of a direct appeal where we exercise supervisory power over the federal trial court proceeding." *Id.*

Petitioner's claim does not meet the high standard to establish a due process violation through improper vouching for a witness. As pointed out by the Michigan Court of Appeals, "the

officers' years of service was not utilized to support the prosecution's contention that defendant was guilty." (MCOA Op. at 4.)   It is plain that the prosecutor's comments were directed towards convincing the jury that the experienced officers were more credible than Petitioner and lacked a motive to lie.  It is appropriate for the prosecutor to invite the jury to examine the testimony they have heard at trial, draw reasonable inferences, and examine the motives witnesses may have for lying.  *See Cantrell v. Gray*, No. 84-3686, 1986 WL 16540, at *3 (6th Cir. Feb. 7, 1986); *see also United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1996); *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir. 1995); *Kappos v. Hanks*, 54 F.3d 365, 368 (7th Cir. 1995).  Moreover, instructing a jury that the arguments are not evidence has sometimes been deemed to cure any improprieties in a closing argument.  *Byrd*, 209 F.3d at 538.  Instructing the jury regarding the methods it should use to evaluate credibility helps to cure any improprieties.  *Id.*  In this action, the court gave both instructions.  (*See* Tr. at 535-39.) Consequently, Petitioner's claim does not rise to the constitutional level.

### V.        References to Unrelated Homicide

Petitioner asserts that he was denied a fair trial in violation of his due process rights because of Detective Blakely's reference to another case he was working on, "the Gleeson homicide." (Pet. at 21.)  Petitioner asserts that "[w]hile the comments may appear on the surface to be an innocent explanation of why DNA samples were not tested in Petitioner's case, the jury may well have interpreted those comments to suggest that Petitioner was in some way connected to that 'Gleeson homicide'." (*Id.*)  Petitioner further asserts that he was denied effective assistance of counsel because counsel did not object to these references. (*Id.*)

The testimony in question is set forth below.  First Detective Blakely testified that:

- 34 -

A      [U]pon the arrest of [Petitioner], there was no physical injuries, and determination through Detective Brack was the blood that we would have found would have been from defensive blows, from her covering, turning, at which time blood would have spattered. It wasn't blood that we would have seen in areas where she had actually been.

       *Also, in conveying with your office at this point in time and recently being involved in a major investigation with the Gleeson homicide, it took us two months to just get the DNA squared around on that particular – and that Michigan State Police Crime Lab would not take anything, unless it was a homicide or a rape, and then they took them on priority from that position on.*

Q      So the lab would not have even analyzed the blood had you sent it in?

A      No, not at this point in time.

Q      Were there latent prints or fingerprints found?

A      Yes, there was. Detective Brack, who's our A-list latent print examiner, and he examines all of the latent prints into [sic] the system which covers this nation. He had pulled latent prints. He had dusted this specific area in here, at which time there were no identifiable prints that he could obtain to match with anybody. He also did check in the course of travel [sic] the area through here, and then he did pull a print off this window, and it appeared, through the blinds, that one had been bent down, and with the blood we thought that maybe it had been the defendant – that the suspect, if he would have looked out that window or he would have been the one injured, it would have been his print, so he did pull that one, which was an identifiable print.

       And then what we did is, once [Petitioner] was arrested we did gain his latent prints, and we compared it with that print off that window, and it was not a match.

(Tr. at 342-44) (emphasis added). Later on direct examination, Detective Blakely testified that the cigarette butt, which was found in the stairwell outside the victim's apartment was not submitted for DNA trace evidence because it was a "moot point" and, as with the blood, the lab would not have been able to process it in time for the trial. (Tr. at 362-63.) In his testimony, he made the following reference to the Gleeson homicide:

- 35 -

Q        Why was that [submitting the cigarette butt for testing for DNA trace evidence] not done?

A        *It is a moot point, due to the fact that we had already established that [Petitioner] had been there and in that hallway, so there was no reason to forward that through.  Again with the previous case, I knew that I had just as much trouble getting DNA on that case, and that a cigarette butt is lesser than the direct blood itself.*

Q        So would the lab have processed that for you in a timely fashion?

A        Not prior to – not to be ready for today.

(Tr. at 362-63) (emphasis added).  On cross-examination Detective Blakely testified that:

Q        [N]o effort was made to determine whether or not [Petitioner's] blood type was found on any of those [blood samples taken from the apartment]?

A        That is correct.

Q        And you are saying that would have to be done by the crime lab?

A        That would have to be – or else private, and we use the Michigan State Police Crime Lab.

Q        And how much would it cost to do it private?

A        Well, are you saying blood type or DNA?

Q        Well, just to get a blood type.

A        *Well, in the Gleeson case, we wanted to get just a blood type, at which time they do not even perform that test anymore, just to make determinations of who that blood belongs to.*  So the only testing that they do from my experience and my knowledge is only DNA testing.  And they do not even take the serum to do the typing anymore.

(Tr. at 366-67) (emphasis added).  Detective Blakely made a final reference to the Gleeson case

when discussing his conversations with Anthony Sok:

- 36 -

Q       And did he also indicate to you that thereafter [going to the bowling lanes] [Anthony and Petitioner] went to Hamilton Creek to see if the salmon were running at Hamilton Creek?

A       The first time none of the – I take that back.  The first time all he did is made reference to Mary VanOmmen, that I could verify it through her.  And there was no mention of Hamilton Dam or other information, and – it wasn't until the second time that he did bring that information forward.

Q       But on the first one you didn't explore what happened after they went to the bowling alley?

A       *At that point in time I was assigned – shortly after that I was assigned to the Gleeson case.*

Q       So you didn't really pursue it in terms of – where they went after the bowling alley?

(Tr. at 378) (emphasis added).  The Michigan Court of Appeals addressed, and rejected, Petitioner's

claim stating as follows:

> Defendant finally argues that defense counsel was ineffective in failing to object when Detective Blakely referred four times during his testimony to a homicide investigation unrelated to defendant.  Because defendant did not move for an evidentiary hearing or new trial based on ineffective assistance of counsel in the trial court, our review is limited to mistakes apparent on the record. *Noble, supra* at 661.  According to defendant, defense counsel's failure to object was prejudicial because the jury may have interpreted Detective Blakely's references to the homicide as meaning defendant was involved in that homicide.  We disagree.  Detective Blakely's comments did not suggest in any way that defendant was involved with a homicide, but rather clearly explained why blood analysis was not done in this case—because due to its backlog, the crime lab was only doing analyses on high priority cases such as homicide and rape.  Defense counsel does not render ineffective assistance of counsel by failing to make a meritless objection. *People v Hawkins,* 245 Mich App 439, 457; 628 NW2d 105 (2001).

(MCOA Op. at 4.)  Although the Michigan Court of Appeals did not specifically address Petitioner's

assertion that he was denied a fair trial because the references to the Gleeson homicide were made

at all, upon review I find it was not an unreasonable application of Supreme Court precedent to

- 37 -

allow Blakely's statements.  For the same reasons, I find that Petitioner was not denied the effective assistance of counsel.

### A.   *Unfair Trial*

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.  State-court admission of certain evidence cannot rise to the level of due process violations unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in evidentiary matters.  *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Petitioner essentially asserts that he was denied a fair trial because the trial court allowed Blakely's statements.  Petitioner was not denied a fundamentally fair trial because of Blakely's references to the Gleeson murder.  As stated by the Michigan Court of Appeals, the comments of Detective Blakely in no way indicated or suggested that Petitioner was involved with the Gleeson murder.  Accordingly, Petitioner's claim falls far short of a due process violation.

- 38 -

B.    *Ineffective Assistance of Counsel*

Petitioner asserts that he received the ineffective assistance of counsel because counsel failed to object to four references to an unrelated homicide by Detective Blakely.  (Pet. at 21.)  In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).  For the same reasons Petitioner was not denied a fundamentally fair trial because Blakely's statements were allowed, he was not denied effective

- 39 -

assistance of counsel.  The references to the Gleeson murder in no way implicated that Petitioner was involved.  The statements were clearly intended to explain why DNA and fingerprint testing was not performed in the investigation underlying this case.  Petitioner's claim of ineffective assistance of counsel fails because counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Chegwidden v. Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).  Counsel's decision not to object to the references to the Gleeson homicide did not fall short of an objective standard of reasonableness.

Where counsel's performance did not fall below an objective standard of reasonableness, the court need not reach the question of prejudice.  *See United States v. Foreman*, 323 F.3d 498, 503 (6th Cir. 2003).  However, Petitioner's claim also fails prejudice prong on the merits.  The *Strickland* Court instructed that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Therefore, the prejudice inquiry must not focus solely on mere outcome determination; attention must be given to "whether the result of the proceeding was fundamentally unfair or unreliable." *Id.* at 369.  There is no indication that the references at issue could have resulted in a proceeding that was fundamentally

unfair or unreliable.   Accordingly, I find Petitioner's claim of ineffective assistance of counsel

meritless.

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:  September 2, 2008                         /s/ Hugh W. Brenneman, Jr.
                                                  HUGH W. BRENNEMAN, JR.
                                                  United States Magistrate Judge

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within eleven (11) days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).   Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).